1

2

3 **UNITED STATES DISTRICT COURT**

4 **NORTHERN DISTRICT OF CALIFORNIA**

5 **SAN JOSE DIVISION**

6

7 JERIT DEVON AARON,                          Case No.  20-cv-01752-BLF

8                         Plaintiff,

9            v.                               **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND DENYING REQUEST FOR EVIDENTIARY HEARING**

10 JOSIE GASTELO,

11                         Defendant.          [Re:  ECF 1]

12

13          Petitioner Jerit Devon Aaron is currently in the custody of Josie Gastelo, warden at

14 California Men's Colony State Prison in San Luis Obispo, California. In 2015, Aaron was

15 convicted of first degree burglary (Cal. Pen. Code §§ 459, 460), assault with intent to commit rape

16 (§ 220, subd. (b)), forcible oral copulation (§ 288a, subd. (c)(2)(A)), two counts of dissuading a

17 witness (§ 136.1, subd. (c)(1)), attempted first degree burglary (§§ 459, 460, subd. (a), 664),

18 robbery (§§ 211, 212.5), assault by force likely to produce great bodily injury (§ 245, subd.

19 (a)(4)), and elder abuse (§ 368). ECF 1 at ¶ 1; ECF 15, Exh. 1.6 at 273. He was sentenced to

20 twenty-five years to life in prison, plus seven years and eight months. ECF 1 at ¶ 2; ECF 15. Exh.

21 1.6 at 274. Aaron has since unsuccessfully pursued direct review in California state court. ECF 1

22 at ¶¶ 3–5; ECF 15, Exhs. 7 (Court of Appeal), 9 (Supreme Court). This matter now comes before

23 the Court on a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). ECF 1. Having

24 considered the parties' submissions, the record in the case, and the applicable law, the Court

25 DENIES the petition and the accompanying request for an evidentiary hearing.

26

27

28

United States District Court
Northern District of California

## I.    BACKGROUND

Aaron's convictions stemmed from three incidents on two different dates. The following facts, presumed to be correct under 28 U.S.C. § 2254(e), are excerpted from the Court of Appeal of California's decision. *See Brown v. Horell*, 644 F.3d 969, 972 (9th Cir. 2011)

A.    Assault and Robbery—December 2013 ("robbery")

On December 17, 2013, 74-year-old Everildo Argueta was exiting the bathroom of a park near Antioch. Aaron walked up to him and punched him in the face and then in the stomach. Argueta was knocked to the ground where he hit his head on the pavement. Aaron searched through Argueta's pockets, took $50 from him, and left. Argueta had never met Aaron and had no idea why Aaron attacked him.

Meanwhile, Norman Cruz and Armando Cardona were driving by the park and witnessed the crime. They stopped the car to help Argueta, but by the time they reached him, Aaron was gone. Cruz and Cardona helped Argueta, the three of them entered the car, and circled the block, looking for Aaron. Cruz called the police, then got out of the car and began looking for Aaron. He briefly spotted him coming out of a liquor store, but lost sight of him as they attempted to treat Argueta's cuts and abrasions in the bathroom of the liquor store. Cruz told the store manager not to let Argueta leave, and Cruz resumed his search for Aaron.

Cruz eventually saw Aaron and approached him aggressively. When Cruz asked Aaron why he did that to the "old man," Aaron proclaimed, "this is my neighborhood." Aaron asked Cruz if Cruz was also from the neighborhood and challengingly said, "What's up?" When Cruz said he was also from the neighborhood, Aaron punched Cruz in the face. Aaron took off running with Cruz in pursuit, but Cruz tripped, hitting his head and elbow on the pavement. In the meantime, others had joined the chase. They caught up with Aaron, brought him to the ground, and restrained him with zip ties until the police arrived.

B.    Attempted First Degree Burglary—April 2014 ("attempted burglary")

At approximately 8 a.m. on April 13, 2014, Gina Brindley was at home sleeping with her young daughter and niece. Someone rang the doorbell, then began banging on the door of her outer security gate. As Brindley left her bed to go to the door, she heard someone on the other side trying to turn the locked door handle to open the security door. She heard the person—whom she later identified as Aaron—say, "let me in." Aaron also stated something like, "I'm trying to switch," or "I'm trying to swish." Brindley opened the inner door and told Aaron, "You have the wrong house." Brindley closed the door, and Aaron left. She testified she was able to observe him face to face for approximately two minutes.

Brindley called the police and took the children to her sister's house. As she returned home, she saw Aaron, standing outside his car in the parking lot of a Burger King. She saw him walk toward a nearby Ramada Inn, then lost sight of him. She called police and provided a description of Aaron. The time was approximately 9:30 a.m.

C.  Sexual Assault of Jane Doe—April 2014 ("sex crime")

Soon after Brindley saw Aaron walk toward the Ramada Inn, Jane Doe, a 34-year-old housekeeping supervisor at the hotel, was going to the building's laundry room to pick up curtains that had been washed. The room was normally locked and not accessible to the public or to hotel guests, but it was used to do the laundry from the guest rooms of the 60 to 100 guests who stayed at the hotel nightly.

As Doe entered the laundry room and turned to pick up the curtains, Aaron came out from behind the boiler. He closed and locked the laundry room door and then approached Doe. When she pushed him to get out, he pushed back, knocking the five-months pregnant Doe to the ground. Aaron dragged her by the hair, then proceeded to take off his pants, and demanded she take hers off as well. When she refused, Aaron attempted to force his penis into her mouth, but Doe refused to open
her mouth.

Doe attempted to call 911 on her cell phone, but Aaron grabbed the phone out of her hands and threw it across the room. Aaron raised his fist as if to strike her belly and said, "No police. No police." He forced his penis into her mouth for five to ten minutes. He ultimately ejaculated on her uniform. He then ran from the room. Doe left the room and approached a colleague who called 911 for her. The 911 call was played for the jury, and Doe also testified. She was panicked at trial and had difficulty looking at Aaron in the courtroom. The whitish stain on Doe's top was tested, and the DNA matched Aaron's.

Meanwhile, Brindley was still outside the Ramada Inn and spotted Aaron exiting the Ramada Inn about 45 minutes after his initial entrance. Brindley called the police again, who responded immediately. After police detained Aaron, Brindley identified Aaron while he was sitting in the officer's patrol car.

ECF 15, Exh. 7 at 2–4.

## II.  LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28

U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant habeas relief unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id*. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000). In addition, the federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Kirkpatrick v. Chappell*, 926 F.3d 1157, 1170 (9th Cir. 2019). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion of the highest court to analyze whether the state judgment was erroneous under the standard of § 2254(d). *Ylst v. Nunnemaker*, 501 U.S. 797, 801–06 (1991).

The U.S. Supreme Court has made clear that § 2254(d)(1) consists of two distinct clauses. "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. It is important, however, that a federal court not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. The pertinent question is whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409.

For the purposes of both clauses, "clearly established Federal law" consists of Supreme Court holdings (not dicta) existing at the time of the relevant state court decision, because only the Supreme Court's holdings are binding on the state courts. *See Williams*, 529 U.S. at 412. Circuit law may nevertheless be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

As apparent from the foregoing, the AEDPA sets forth a highly deferential standard for evaluating state court rulings: It requires a state prisoner to "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Moreover, even if a petitioner establishes a constitutional violation under the relevant standard, that is only the first hurdle the petitioner must clear. "[H]abeas petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under this test, relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (internal quotations omitted).

With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## III.   DISCUSSION

In his petition, Aaron asserts the following claims for relief:

1.  Aaron was denied his Fifth and Fourteenth Amendment right to due process because insufficient evidence supported Aaron's convictions for first degree burglary, attempted first degree burglary, and dissuading a witness. ECF 1 at 33.

2.  Aaron was denied his Fourteenth Amendment right to due process because his cases were improperly consolidated. ECF 1 at 41.

3.  Aaron was denied his Fourteenth Amendment right to due process because of the cumulative effect of multiple constitutional errors. ECF 1 at 29.

The Court addresses these claims *seriatim*. As to each, the Court considers whether there has been a constitutional violation and if so, whether any error was harmless. There is no dispute that the California Court of Appeal's decision on direct appeal is the "last explained state-court judgment." *Ylst*, 501 U.S. at 801–06. Accordingly, the Court reviews that decision.

### A.  Claim 1: Insufficient Evidence

At the close of the State's case, Aaron moved for acquittal on first degree burglary, attempted first degree burglary, and dissuading a witness charges under Cal. Pen. Code § 1118.1. ECF 1 at 34; ECF 15–17 at 11–12. Under § 1118.1, the trial court considers "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged." *People v. Stevens*, 41 Cal.4th 182, 200 (2007); *see* ECF 15–17 at 11. The trial court denied the motion and the Court of Appeal upheld its decision. ECF 15–17 at 11–19. Aaron contends that the trial court erroneously denied the motion in violation of his Fifth and Fourteenth Amendment constitutional rights. ECF 1 at 34 (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged*." In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational

trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson*, 443 U.S. at 321, which, if proven, entitles him to federal habeas relief, *see id*. at 324.

The Supreme Court has emphasized that "*Jackson* claims face a high bar in federal habeas proceedings...." *Coleman v. Johnson*, 566 U.S. 650,  651 (2012) (per curiam) (finding that the Third Circuit "unduly impinged on the jury's role as factfinder" and failed to apply the deferential standard of *Jackson* when it engaged in "fine-grained factual parsing" to find that the evidence was insufficient to support petitioner's conviction). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993); *see, e.g., Coleman*, 566 U.S. at 656 ("the only question under Jackson is whether [the jury's finding of guilt] was so insupportable as to fall below the threshold of bare rationality"). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Payne*, 982 F.2d at 338 (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992–93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

In sum, sufficiency claims on federal habeas review are subject to a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). First, relief must be denied if, viewing the evidence in the light most favorable to the prosecution, there was evidence on which "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (quoting *Jackson*, 443 U.S. at 324). Second, a state court decision denying a sufficiency challenge may not be overturned on federal habeas unless the decision was

"objectively unreasonable." *Id*. (quoting *Cavazos v. Smith*, 565 S.Ct. 1, 2 (2011)).

### i. First Degree Burglary

Aaron first contends that the state court unreasonably found the evidence sufficient to support the burglary of the Ramada Inn laundry room where he sexually assaulted Jane Doe. ECF 1 at 35–36. He specifically notes that it was error for the jury, the magistrate judge, the trial court, and the Court of Appeal to conclude that "the laundry room was 'inhabited' for purposes of the first degree burglary statute." ECF 1 at 35–36.

The Court of Appeal first summarized Cal. Pen. Code § 459:

> Section 459 reads in pertinent part, "Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel . . . with intent to commit grand or petit larceny or any felony is guilty of burglary." Section 460 reads in relevant part: "(a) **Every burglary of an inhabited dwelling house, vessel, . . . , which is inhabited and designed for habitation, floating home, . . . or trailer coach, . . . or the inhabited portion of any other building, is burglary of the first degree**. [¶] (b) All other kinds of burglary are of the second degree." For purposes of determining whether burglary is of the first degree, " 'inhabited' means currently being used for dwelling purposes, whether occupied or not." (§ 459.)

ECF 15–17 at 12 (emphasis added). It then concluded a laundry facility could be an inhabited dwelling:

> A laundry facility can be an inhabited dwelling. (*People v. Woods* (1998) 65 Cal.App.4th 345, 349 (*Woods*).) In *Woods*, defendant was convicted of first degree burglary for breaking into an apartment complex's laundry room. (*Id.* at p. 347.) **Like Aaron in this case, defendant in Woods argued that a commercial laundry facility was not an inhabited dwelling because it was not an "integral part" of any of the individual dwelling units in the apartment complex. (*Id.* at p. 349.) The court disagreed, stating the laundry room was a place where the tenants of the building would come and do their household chores and because of this, the court had no problem deeming the room an "integral part of the complex and thus an inhabited dwelling."** (*Ibid.*) In so holding, the court determined the laundry room did not need to be an integral part of any individual apartment unit, so long as it was an integral part of the building in which such living units were housed. (*Id.* at pp. 348–349.)

ECF 15–17 at 13 (emphasis added). It also discussed the trial court's application of the

United States District Court
Northern District of California

"reasonable expectation test":

> The court also employed the "reasonable expectation test" for an inhabited dwelling proffered in *People v. Brown* (1992) 6 Cal.App.4th 1489, 1496. "'**Since one of the purposes of the burglary statute is to protect against unauthorized entry and the attendant danger that the occupant will react violently to the intrusion, the reasonable expectation test focuses on the protection the inhabitants of a structure reasonably expect**. [Citations.] In situations implicating this particular purpose, **the proper question is whether the nature of a structure's composition, is such that a reasonable person would expect some protection from unauthorized intrusions.**'" (*Woods*, supra, 65 Cal.App.4th at p. 349, quoting *Brown*, at p. 1496.) Defendant asserted the tenants did not have an expectation of privacy in the laundry facility because the tenants should expect strangers in such a place. (*Woods*, at p. 349.) **The *Woods* court quickly rejected this argument stating that defendant "ignores the fact that the 'strangers' a tenant would expect to meet in the laundry room were fellow tenants doing laundry, not burglars.** The evidence established the room was usually kept locked so that only tenants were permitted access to it. This evidence is sufficient to support a finding, under the reasonable expectation test, that the laundry room is an area where tenants would expect protection from unauthorized intrusions, and thus it qualifies as an inhabited dwelling." (*Ibid.*)

ECF 15–17 at 13–14. The Court then applied *Woods* and the reasonable expectation test to conclude that the Ramada Inn laundry room qualified as an inhabited dwelling:

> Here, **while the Ramada Inn is not an apartment complex and the users of the laundry room are employees rather than tenants, we find this to be a distinction without a real difference**. First, a hotel is just like an apartment building. It is inhabited by numerous people; the only difference is that hotel "tenants" change more frequently. Historically and traditionally, hotel rooms have been included within the definition of a dwelling house (Perkins, Criminal Law (3d ed. 1982) p. 257; *see People v. St. Clair* (1869) 38 Cal. 137, 138 [lodger's room in rented house]; *People v. Fleetwood* (1985) 171 Cal.App.3d 982, 986–988 [occupied hotel room is dwelling house for purposes of first degree robbery and burglary]), and even a hotel lobby has been considered part of an "inhabited dwelling house," making robbery of a hotel desk clerk a first degree robbery under section 212.5. (*People v. Wilson* (1989) 209 Cal.App.3d 451, 453.)

> **The Ramada Inn laundry room is a locked facility where the employees go to do the hotel's laundry and cleaning tasks, like the "household chore[s]" in *Woods*. (*Woods*, supra, 65 Cal.App.4th at p. 349.) Those chores are done for the benefit of the hotel's guests, just as an apartment resident might hire a housekeeper to do his or her laundry, and thus the laundry room is functionally interconnected with the hotel's inhabited**

**living quarters**. Finally, the Ramada Inn laundry room is contiguous to the building—given its location inside the hotel on the first floor—and interconnected with the hotel's operations. **Thus, the rationale of *Woods* supports the judge's denial of the motion for acquittal of the first degree burglary charge relating to Doe**.

Aaron's contention also fails the reasonable expectation test. **Like the laundry facility in *Woods*, the Ramada Inn laundry room is kept locked so that only employees may access it. Employees at the Ramada Inn expect the absence of burglars in their laundry room just as much as the tenants in Woods expected such absence in theirs**. Doe would expect to run into other coworkers but not a strange man lunging from behind the boiler prepared to sexually assault her. Being trapped in a small locked room with a stranger who entered without permission made Doe more vulnerable, just as a resident victimized in his or her own living quarters is more vulnerable and more likely to react violently upon encountering a stranger than if they were in a public space. (*See, e.g., Woods, supra*, 65 Cal.App.4th at p. 349; *People v. Fleetwood, supra*, 171 Cal.App.3d at p. 987**.) Thus, the policy reasons for making residential burglary a more serious offense than commercial burglary support recognition of the laundry room as part of an inhabited dwelling house for purposes of section 459**. Accordingly, we conclude the evidence was sufficient to support a first degree burglary conviction, and the trial judge did not err in sending the charge to the jury.

ECF 15–17 at 14–15 (emphasis added).

As an initial matter, the Court notes that to the extent Aaron's argument serves as an attack of the state court's interpretation of Cal. Pen. Code § 459, the Court rebuffs it. *See* 28 U.S.C. § 2254(d) (limiting federal habeas review of state court judgments); *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law." (internal quotation marks omitted)).

The question the Court focuses on is whether the state court acted unreasonably when it rejected Aaron's sufficiency claim during his direct appeal. *Parker*, 567 U.S. at 43 (citing *Jackson*, 443 U.S., at 319 and *Cavazos*, 565 U.S. at 2); *see also* 28 U.S.C. § 2254(d)(2). The Court of Appeal reasonably rejected Aaron's argument that the laundry room was not inhabited because it was locked and only accessible to staff. *See* ECF 1 at 35. Here, the Court of Appeal identified the applicable state law principles— Cal. Pen. Code § 459 and its policy intent, the reasonable expectation test and *Woods*—and applied them to the evidence. Aaron does not dispute that

10

Ramada Inn workers such as Doe used the laundry room for the benefit of the hotel guests. Nor does he dispute that the Ramada Inn workers had a reasonable expectation of some protection from unauthorized intrusions while they worked in the laundry room—particularly since the door was kept locked. For similar reasons, Aaron's argument that under the Court of Appeal's rationale, "literally anything in a hotel could be said to be within an inhabited dwelling" fails. ECF 1 at 35. The state court's decision was the result of its interpretation of Cal. Pen. Code § 459—which this Court may not review—and a reasonable determination of the facts in light of the evidence presented in the state court proceeding.

### ii. Attempted First Degree Burglary

Aaron next contends that there was insufficient evidence to support his conviction for the attempted burglary of Brindley's apartment. ECF 1 at 36-39. The Court of Appeal began by explaining the law of attempt under Cal. Pen. Code § 664:

> "Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its perpetration, shall be punished where no provision is made by law for the punishment of those attempts, as follows: (a) If the crime attempted is punishable by imprisonment in the state prison, . . . the person guilty of the attempt shall be punished by imprisonment in the state prison or in a county jail, respectively, for one-half the term of imprisonment prescribed upon a conviction of the offense attempted." "**An attempt to commit a crime requires a specific intent to commit the crime and a direct but ineffectual act done toward its commission**. [Citation.] The act must go beyond mere preparation, and it must show that the perpetrator is putting his or her plan into action, but the act need not be the last proximate or ultimate step toward commission of the substantive crime. [Citation.]" (*People v. Kipp*, *supra*, 18 Cal.4th at p. 376.)

ECF 15–17 at 15 (emphasis added). It then discussed the meaning of "entry" within the context of burglary:

> In the case of burglary, "For an entry to occur, a part of the body or an instrument must penetrate the outer boundary of the building. [Citation.] 'In most instances, of course, the outer boundary of a building for purposes of burglary is self-evident. Thus, in general, **the roof, walls, doors, and windows constitute parts of a building's outer boundary, the penetration of which is sufficient for entry.'** [Citation.]" (*Magness v. Superior Court* (2012) 54 Cal.4th 270, 273–274, italics added.)

United States District Court
Northern District of California

ECF 15–17 at 15–16 (emphasis added). The court went on to determine that there was sufficient evidence to support Aaron's conviction for attempted burglary because the record indicated Aaron was putting his plans of burglary into action by banging on Brindley's door, ringing her doorbell, and attempting to open the locked door handle:

> Although the evidence did not show a physical intrusion by Aaron, he was charged with and convicted of  attempted burglary. **His attempting to turn the door handle on a locked outer door was sufficient to constitute an attempt. Jiggling a window is enough to support an attempted burglary conviction (*People v. Goode* (2015) 243 Cal.App.4th 484, 487), and jiggling a door handle stands on the same footing**.

> There is sufficient evidence in this record to support Aaron's conviction. **The evidence shows that in the early morning, Aaron banged on the door, rang the doorbell multiple times, and repeatedly attempted to open the locked outer door. The evidence was sufficient to support the inference that had Aaron been able to turn the handle, the burglary would not only have been attempted but completed. Aaron was "putting his . . . plan into action,"** and thus, the trial court did not err in denying his motion for acquittal on the attempted first degree burglary charge. (*Kipp*, *supra*, 18 Cal.4th at p. 376.)

ECF 15–17 at 16 (emphasis added). It also concluded that Aaron's conviction for the assault of Jane Doe satisfied § 459's intent requirement:

> As explained, section 459 has a felonious-intent requirement (i.e., "with intent to commit grand or petit larceny or any felony"). Having concluded evidence of the completed sex crime against Doe would be admissible to prove Aaron's intent in the attempted burglary (pursuant to section 1101, subdivision (b)), **the jury could have inferred that Aaron's attempted entry into Brindley's apartment was accompanied by the intent to commit sexual assault, thus satisfying the felonious-intent element of section 459**.

ECF 15–17 at 16 (emphasis added).

Aaron's claim is without merit. The state court did not act unreasonably when it rejected his sufficiency challenge. *See Parker*, 567 U.S. at 43 (citing *Jackson*, 443 U.S., at 319 and *Cavazos*, 565 U.S. at 2). Aaron contends the evidence was insufficient to prove intent because his "actions with respect to Brindley's home [were] at least as equivocal as the defendant's actions in

*Miller*." ECF 1 at 38 (citing *People v. Miller*, 2 Cal.2d 527, 530 (1935). In *Miller*, the Supreme Court of California reversed defendant Charles Miller's conviction for attempted murder because his conduct was too equivocal to ground attempt liability. *Id*. at 533. Miller had walked toward his rival with a rifle and stopped 180-230 yards away from him to apparently load his rifle, but never lifted or pointed the rifle at his rival and instead walked toward and surrendered to a nearby sheriff. *Id*. at 529. However, the question before the Court is not whether Aaron's acts were as equivocal as Miller's, so that Aaron, too, cannot be guilty for an attempted act. Instead, the question is whether the Court of Appeal reasonably rejected his sufficiency challenge. The answer is clearly yes. Evidence shows that early in the morning, Aaron banged on the door of Brindley's apartment, rang the doorbell multiple times, and repeatedly attempted to open the locked outer door. Aaron does not contest this evidence.

Aaron also argues that "there was no evidence petitioner intended to commit one of the enumerated felonies" required by Cal. Pen. Code § 459. ECF 1 at 38. Again, the Court of Appeal reasonably concluded that there was ample evidence supporting the jury's verdict. And the conflicting evidence at trial on which Aaron relies—Brindley's testimony that Aaron made no further attempts to enter her residence or another residence and his own testimony that his actions underscored a desire to find a bathroom—was presented to the jury to consider in their deliberations. *See Cavazos*, 565 U.S. 1 at 2 ("it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial"). The Court of Appeal reasonably concluded the subsequent sexual assault of Jane Doe in the Ramada Inn laundry room provided the jury with evidence of his intent to commit sexual assault in the attempted burglary of Brindley's apartment. ECF 15–17 at 16; *see People v. Holloway* (2004) 33 Cal. 4th 96, 138 ("evidence of another sexual assault linked to the charged attack, together with the physical evidence surrounding the attack itself, sufficiently supported the finding of sexually assaultive intent.").

### iii.   Dissuading a Witness by Force or Threats

Finally, Aaron contends there was insufficient evidence to support his two convictions for dissuading a witness with force or threats. ECF 1 at 39–30. The Court of Appeal first summarized Cal. Penal Code § 136.1:

> Section 136.1 "defines a family of 20 related offenses." (People v. Torres (2011) 198 Cal.App.4th 1131, 1137.) Subdivision (b) of section 136.1 provides in relevant part: "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment in a county jail for not more than one year or in the state prison: (1) Making any report of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge. [¶] . . . [¶] (3) Arresting or causing or seeking the arrest of any person in connection with that victimization."

> Section 136.1, subdivision (c) designates a violation of either subdivision (a) or (b) **as a felony, and provides for a higher range of punishment, when the defendant dissuades or attempts to dissuade the witness by means of force or threat of violence, acts in furtherance of a conspiracy, acts for pecuniary gain, or has been previously convicted of the same offense**. (See generally, People v. Torres, supra, 198 Cal.App.4th at p. 1138.)

ECF 15–17 at 16–17 (emphasis added). The court then discussed the evidence supporting Aaron's conviction for his actions against Cruz:

> Cruz followed Aaron out of the park, for the evident purpose of assisting in his apprehension. Although the police had been called, they were not at the scene of the confrontation between Aaron and Cruz. When Cruz located Aaron and confronted him as to why he had assaulted Argueta, Aaron responded, "What's up," "this is my neighborhood," and then punched Cruz in the face. Cruz chased Aaron in an attempt to detain him, but Cruz fell and hit his head and his elbow before he could apprehend Aaron.

> The purpose of Cruz's actions could easily be inferred: to make sure Argueta's assailant would not escape. This was further strengthened by Cruz's act of asking the store manager to keep Argueta nearby, which shows that Cruz wanted to ensure Argueta would be available to identify Aaron as the assailant when the police arrived.

> Aaron's later confrontation with Cruz could be construed as an attempt to dissuade him from reporting Aaron to the police. Aaron's verbal references— "what's up" and "this is my neighborhood"—could easily be interpreted as

efforts to intimidate Cruz from calling the police, from assisting the police in his identification or capture, or from testifying in the future. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1730 ["In some circles, 'What's up?' is considered a challenge to fight"].) And punching Cruz in the mouth was blatantly intended to assist Aaron in his effort to escape apprehension and to deter Cruz from pursuing him.

It then rejected Aaron's argument that, because Cruz contacted the police before Aaron dissuaded him, § 136.1(b) did not apply:

> Aaron argues section 136.1, subdivision (b) targets only "prearrest" efforts to prevent a crime from being reported to the authorities, or to prevent an action from being prosecuted, citing People v. Navarro (2013) 212 Cal.App.4th 1336, 1347. That restriction applies at most to subdivision (b)(1), and contrary to Aaron's assertion, there is no rule that precludes a conviction for dissuading a witness after police have already been contacted. "Subdivision (b)(2) clearly encompasses more than prearrest efforts to dissuade, inasmuch as it includes attempts to dissuade a victim from causing a complaint or information to be prosecuted or assisting in that prosecution." (*People v. Velazquez* (2011) 201 Cal.App.4th 219, 233.) Here, Aaron attempted to prevent Cruz from assisting in his apprehension and identification as the assailant. Thus, Aaron's actions fell under subdivision (b)(3) of section 136.1, which prohibited him from hindering someone in arresting him or causing his arrest. The evidence was sufficient to sustain the dissuading charge.

ECF 15–17 at 17–18. With respect to Aaron's conviction for his actions toward Doe, the Court rejected Aaron's reliance on *People v. Leon* 243 Cal.App.4th 1003 (2016) and concluded there was ample evidence of dissuasion:

> Aaron cites *People v. Leon* (2016) 243 Cal.App.4th 1003, 1027 as an instance where the Court of Appeal reduced a felony dissuading conviction to the lesser included offense of dissuading without force or violence. He argues that his act of taking the victim's cell phone was at most sufficient to prove an attempt to dissuade the victim from reporting without force. (Id. at p. 1027.) The portion of Leon that Aaron cites contains only the disposition of that case. The published portion of the opinion does not discuss the facts of the case, nor does it contain any portion of the relevant analysis pertaining to dissuading a witness (by force or otherwise). Thus, it is not authority for Aaron's proposition.
>
> More importantly, the act of throwing the phone was not the only evidence of dissuading. Aaron also threatened, with a raised fist, to punch Doe in the stomach if she contacted the police, thereby threatening to injure not only her, but her unborn child. "No police. No police," he commanded. "He only said to me not to tell the police because if I did, he was going to hit me on my belly." Doe specifically confirmed she was scared for the safety of her unborn

baby. There was ample evidence to support the felony dissuading conviction.

ECF 15–17 at 18 (emphasis added).

The state court was not unreasonable when it concluded that there was sufficient evidence to support both charges of dissuading a witness. *See Parker*, 567 U.S. at 43 (citing *Jackson*, 443 U.S., at 319 and *Cavazos*, 565 U.S. at 2).

In challenging his conviction for his actions toward Cruz, Aaron argues that "there was no evidence to suggest that merely looking at Cruz was intended to keep Cruz from contacting the police." ECF 1 at 40. The Court of Appeal emphatically rejected this argument, finding that Aaron verbally threatened Cruz before punching him in the face. ECF 15–17 at 17–18. (citing *People v. Lee*, 28 Cal.App.4th 1724, 1730 (1994) ("In some circles, 'What's up?' is considered a challenge to fight.")). In light of these facts, the Court of Appeal reasonably concluded Aaron's verbal threats "could easily be interpreted as efforts to intimidate Cruz" from calling or otherwise assisting the police in his capture and Aaron's physical assault of Cruz "blatantly" was intended to prevent Cruz from pursing Aaron. ECF 15–17 at 18.

Aaron also doubled down on his argument that Cal. Pen. Code § 136.1(b) is limited to preventing prearrest conduct. ECF 1 at 39. The Court of Appeal disagreed, concluding that Cal. Pen. Code § 136.1(b) embraces conduct that occurs after the police have been contacted. ECF 15–17 at 18.  This Court, again, stresses that it is not within its mandate to review the state court's interpretation of its own law. *See* 28 U.S.C. § 2254(d) (limiting federal habeas review of state court judgments). The Court of Appeal reasonably concluded sufficient evidence supported Aaron's conviction under Cal. Pen. Code § 136.1(b).

In challenging his conviction for his actions toward Doe, Aaron argues that the Court "could conclude that the evidence was insufficient to support a conviction for attempting to dissuade a witness by force or threats, but was sufficient to support a conviction for the lesser included offense. . . because the jury could have reasonably concluded that the removal of Doe's

16

phone was done to prevent her from reporting her victimization to law enforcement." ECF 1 at 40. The Court rejects this invitation as it mischaracterizes the Court's responsibility in analyzing an insufficient evidence claim in a habeas petition. The Court of Appeal reasonably concluded that there was ample evidence—Doe's testimony that Aaron grabbed her phone, threw it, and threatened to punch her stomach— that Aaron's dissuasion was carried out by violence or threat. *See* ECF 15–17 at 18.

### B.  Claim 2: Misjoinder

On direct appeal, Aaron argued that the trial court abused its discretion in denying severance of his December 2013 and April 2014 cases. *See* ECF 15–17 at 4. The Court of Appeal rejected this challenge, concluding that Cal. Pen. Code § 954 applied and Aaron did not clearly show that joinder was prejudicial. ECF 15–17 at 7–11; *see Williams v. Superior Court*, 36 Cal.3d 441, 447 (1984) (where statutory requirements of joinder pursuant to Cal. Pen. Code § 954 are met, "petitioner can predicate error only on clear showing of prejudice"). In making these conclusions, the Court of Appeal found that (1) the attempted burglary and sex crime were cross-admissible, (2) the robbery and sex crime were crimes of the same class, (3) consolidation favored judicial economy, (4) neither the robbery nor the sex crime was more starkly inflammatory than the other, (5) the evidence supporting the robbery and sex crime were of relative equal strength, and (6) none of the charges, standing alone or when joined, was a capital offense. ECF 15–17 at 7–11; *see People v. Mendoza*, 24 Cal.4th 130, 160 (2000) (listing factors to consider when reviewing whether a trial court abused its discretion in denying severance). In this collateral attack, Aaron now contends that the joinder of the December 2013 and April 2014 offenses violated his Fourteenth Amendment right to due process. ECF 1 at 41-45.

The Supreme Court has stated that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial."

United States District Court
Northern District of California

*United States v. Lane*, 474 U.S. 438, 446 n. 8 (1986). The Ninth Circuit, however, has found that this comment constitutes dicta, because *Lane* concerned joinder under the Federal Rules of Criminal Procedure and no constitutional issue was before the Supreme Court. *Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010). There is no clearly established Supreme Court precedent on point here, which presents a roadblock to Aaron's challenge that the state court acted contrary to clearly established Supreme Court precedent under § 2254(d)(1). *See Williams*, 529 U.S. at 412.

Nonetheless, there is a line of Ninth Circuit decisions concluding that misjoinder can be grounds for habeas relief if it renders the defendant's trial fundamentally unfair. *See Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004); *Sandoval v. Calderon*, 241 F.3d 765, 771–72 (9th Cir. 2001), *cert. denied*, 534 U.S. 847 (2001) *and cert. denied* 534 U.S. 943 (2001); *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991). As recently as this year, the Ninth Circuit has suggested this theory still has viability. *See Cook v. Kernan*, 948 F.3d 952, 974, n.1 (9th Cir. 2020) ("Even if we were to consider the question of prejudice through the lens of an improper joinder claim, the California Supreme Court reasonably found on direct appeal that the trial court's joinder of the charges was proper . . . ) (Callahan, concurring).

To the extent such a claim does exist, this Court may grant habeas relief on a joinder challenge only "if the joinder resulted in an unfair trial. There is no prejudicial constitutional violation unless 'simultaneous trial of more than one offense ... actually render[ed] petitioner's state trial fundamentally unfair and hence, violative of due process.'" *Sandoval*, 241 F.3d at 771–72 (quoting *Featherstone*, 948 F.2d at 1503) (omissions and modifications in original). The requisite level of prejudice is reached only "if the impermissible joinder had a substantial and injurious effect or influence in determining the jury's verdict." *Sandoval*, 241 F.3d at 772 (citing *Bean*, 163 F.3d at 1086 (9th Cir.1998)). "In evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of evidence and the danger of 'spillover' from one charge to

another, especially where one charge or set of charges is weaker than another." *Davis*, 384 F.3d at

638 (citing *Sandoval*, 241 F.3d at 772).

### i.    Cross-Admissibility

Aaron first argues that "there was no cross-admissibility" between the robbery and the

sexual assault charges because none of the evidence introduced to support one charge would be

admissible to support the other. ECF 1 at 43. He also contends that the Court of Appeal

unreasonably found that the attempted burglary of Brindley's apartment and the sexual assault of

Doe were connected. ECF 1 at 43.

When considering Aaron's appeal, the state court explained that "[t]he first step in

assessing whether a combined trial was prejudicial is to determine whether evidence from each

case would be admissible under Evidence Code section 1101. If so, the inference of prejudice is

dispelled." ECF 15–17 at 6 (citing *People v. Balderas*, 41 Cal.3d 144, 171-172 (1985)).

Accordingly, it outlined Evidence Code section 1101:

> Evidence Code section 1101 (section 1101) assists us in determining what,
> if any, evidence is cross-admissible.   It reads in pertinent part, "(a)...
> evidence of a person's character or a trait of his or her character (whether in
> the form of an opinion, evidence of reputation, or evidence of specific
> instances of his or her conduct) is inadmissible when offered to prove his or
> her conduct on a specified occasion. [¶]    (b) **Nothing in this section
> prohibits the admission of evidence that a person committed a crime,
> civil wrong, or other act when relevant to prove some fact (such as
> motive, opportunity, intent, preparation, plan, knowledge, identity,
> absence of mistake or accident...) other than his or her disposition to
> commit such an act."**

> "Evidence of uncharged crimes is admissible to prove identity, common
> design or plan, or intent only if the charged and uncharged crimes are
> sufficiently similar to support a rational inference of identity, common
> design or plan, or intent.  [Citation]" (*People v. Carter* (2005) 36 Cal.4th
> 1114, 1147.)  Additionally, to be admissible under section 1101, subdivision
> (b), the probative value of the evidence of uncharged crimes "must be
> substantial and must not be largely outweighed by the probability that its
> admission would create a serious danger of undue prejudice, of confusing
> the issues, or of misleading the jury."  (*People v. Kipp* (1998) 18 Cal.4th
> 349,371(*Kipp*).)

United States District Court
Northern District of California

ECF 15–17 at 6–7. It then applied those principles in considering the cross-admissibility of the burglary of Brindley's apartment and the sexual assaults against Doe, ultimately concluding that the evidence between the two cases was cross-admissible for intent purposes:

> **Applying [Evidence Code] section 1101, subdivision (b) to Aaron's case, if these two crimes were tried separately, we find that the sex crime against Doe would be admissible to prove Aaron had the same intent when attempting to burglarize Brindley.** The People's theory, set forth in the information, was that Aaron tried to enter Brindley's apartment with the "intent to commit rape or sexual assault." The fact that Aaron sexually assaulted a pregnant woman in the Ramada Inn laundry room fewer than two hours after his stop at Brindley's apartment would support the inference that he had the intent to commit a similar felony at Brindley's (i.e., rape or sexual assault). The record shows that Aaron banged on Brindley's door in the early morning. Even before Brindley opened the door, Aaron was trying to turn the door handle and enter the apartment. After being refused entry and being unable to open the locked outer door, Aaron left and then made his way to the nearby Ramada Inn where he sexually assaulted a pregnant housekeeper in the laundry room. The jury could reasonably infer from these circumstances that Aaron had the same intent with Brindley that he did with Doe. **Because section 1101, subdivision (b) applies here, the evidence for these hypothetical separate trials would be cross-admissible. This "dispel[s] any possibility of prejudice" with respect to joinder of these two crimes. (*Williams*, *supra*, 36 Cal.3d at p. 448.)**

ECF 15–17 at 7–8. It also concluded that the two crimes were "connected together in their commission" based on the common thread of Aaron's "felonious intent":

> **Crimes that occur at "'different times and places against different victims are nevertheless "connected together in their commission" when they are . . . linked by a "'common element of substantial importance.'"'"** (*Mendoza*, *supra*, 24 Cal.4th at p. 160.) In *Mendoza*, defendant was charged with residential robbery, four counts of robbery, three counts of kidnapping for purposes of robbery, two counts of commercial burglary, forcible rape and arson with great bodily injury, and murder, involving four separate incidents. (Id. at p. 148.) One incident involved a liquor store robbery, another involved the kidnapping and robbery of three people, a third incident involved two separate burglaries, and the fourth involved the rape, robbery, arson causing great bodily injury, and murder of a woman. The People's motion to consolidate the charges was granted. Defendant was convicted on all counts and sentenced to death. (*Ibid*.)

> Defendant argued the trial court erred in consolidating the charges brought against him in four separate cases and in denying his motion to sever the robbery of a liquor store and the kidnapping and robbery of three people from the murder charge. (*Mendoza*, supra, 24 Cal.4th at p. 159.) Our Supreme

Court disagreed, taking note that defendant's crimes all happened within a short time span. The liquor store robbery happened at 4 p.m. on February 5; the car robbery and kidnapping of three people occurred at 2:20 a.m. the next morning; the commercial burglaries were perpetrated either during the evening of February 6, or early the next morning; the fourth incident, which involved the rape, robbery, and murder of a woman occurred on the afternoon of February 7, between 2 and 3 p.m. (*Id*. at p. 160.) Finally, the court noted that the liquor store robbery, the commercial burglaries, and the robbery of a woman "all involved the intent to illegally obtain property . . . [therefore, the court found] the "element of intent to feloniously obtain property [ran] like a single thread through the various offenses . . . ." [Citations.]' " (*Ibid*.)

**The attempted burglary of Brindley's apartment and the sex crime against Doe likewise were connected together in their commission. Here, the attempted burglary of Brindley's apartment and the sex crime happened within 90 minutes of each other.** Aaron went to Brindley's apartment, attempted to enter her residence, was unsuccessful, and then made his way to the Ramada Inn where he sexually assaulted Doe. What Aaron did on this April day resembles the type of crime spree conduct that often satisfies the "connected together in their commission" requirement of section 954. (*E.g., Mendoza, supra*, 24 Cal.4th at pp. 159-160; *People v. Kelly* (1928) 203 Cal. 128, 131-133; *see generally, Balderas, supra*, 41 Cal.3d at pp. 170-173.) **Given the cross-admissibility discussion above, the ""common element of substantial importance""" here would be the overlap in Aaron's intent to commit sexual assault. This shows that the crimes were connected together in their commission, regardless of the fact that they technically occurred at different places and against different victims. Aaron's felonious intent "'[ran] like a single thread through the various offenses.'" (*Mendoza, supra*, 24 Cal.4th at p. 160.)**

ECF 15–17 at 7–9.

Aaron fails to demonstrate that the trial court's refusal to bifurcate the attempted burglary and the sexual assault charges had a "substantial and injurious effect" on the verdict and thereby deprived him of a fair trial under the Constitution. In its well-reasoned opinion, the Court of Appeal determined that under state evidentiary rules, evidence from the sexual assault case was admissible to prove intent in the attempted burglary case. As such, the Court of Appeal reasonably dismissed any inference of prejudice in the joinder, and Aaron does not allege any specific reasons why this Court should determine otherwise. *See Balderas*, 41 Cal.3d at 171-172 (where "evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others . . . any inference of prejudice is dispelled."). And although Aaron

21

contends that there was no evidence of "felonious intent" that could be inferred from his conduct at Brindley's apartment, ECF 1 at 43, the Court of Appeal reasonably concluded the opposite. *See* Section A.2.

With respect to the robbery and sexual assault charges, Aaron argues that there is no cross-admissibility and, indeed, the Court of Appeal did not determine otherwise. *See* ECF 15–17 at 7–9 (focusing solely on cross-admissibility of attempted burglary and sexual assault). There is "a high risk of undue prejudice whenever . . . joinder of counts allows evidence of other crimes to be introduced in a trial of charges with respect to which the evidence would otherwise be inadmissible." *United States v. Lewis*, 787 F.2d 1318, 1322 (9th Cir.1986). However, as the Court of Appeal explained "[a] lack of cross-admissibility . . . does not necessarily mean the trial judge abused his or her discretion by joining the cases for trial." ECF 15–17 at 6 (citing *Balderas*, 41 Cal.3d at 172-173). To this end, the state court considered other factors to determine if joinder was prejudicial. For example, it found that the two crimes were of the same class as both involved physical assaults on vulnerable victims. ECF 15–17 at 9. And, as discussed at length below, it determined that neither crime was "starkly more inflammatory than the other" and that there was ample evidence supporting both crimes such that there was not a risk of bootstrapping. ECF 15–17 at 11.[1]

### ii.    Comparative Strength of Cases

Aaron argues that the Court of Appeal erred in concluding that the State did not join a weaker case—the robbery—with a stronger case—the sexual assault. ECF 1 at 43–44. In

---

[1] The Court also notes that the trial court gave a jury instruction that "certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other." ECF 15–3 at 82; *see Davis*, 384 F.3d at 639 ("any prejudice [from joinder] was further limited through an instruction directing the jury to consider each count separately"). The Court of Appeal did not rely on these instructions in its conclusion that joinder was not prejudicial.

particular, he argues that the "problems of identification and the inconsistent testimony between the witnesses" in the robbery case paled in comparison to the DNA evidence and consent-based defense associated with the sexual assault case. See ECF 1 at 44.

In weighing the evidence between the two crimes, the Court of Appeal concluded:

> To the extent Aaron argues the evidence of the robbery is weak compared to the sex crime, likewise, we find the evidence is to the contrary. There were multiple witnesses to the robbery of Argueta and capture of Aaron, including Cruz, Cardona, the liquor store manager, and the police officers who later arrived at the scene to find Aaron restrained with zip ties. Argueta identified Aaron in a photographic lineup and testified that he never saw his $50 again. Had the robbery case been tried alone, the likelihood of conviction was great. The evidence was not so "weak" as to make the robbery an improper candidate for joinder.

ECF 15–17 at 11.

The Court of Appeal reasonably concluded that the State did not join "a strong evidentiary case with a much weaker case in the hope that the cumulation of the evidence would lead to convictions in both cases." *Sandoval*, 241 F.3d at 772; *see also Davis*, 384 F.3d at 639 (rejecting a habeas challenge on the basis of joinder where "the weight of evidence in the [] cases was roughly equivalent"). In particular, the evidence supporting the robbery conviction was not so weak such that evidence of the sexual assault prejudicially bootstrapped the case to conviction.

As the Court of Appeal noted, the robbery conviction was supported by multiple witnesses. ECF 15–17 at 11. The jury heard testimony from Cruz, Cardona, Officer Christopher Kidd, and Frederick Clairmonte. Cruz testified that he observed Aaron hit an old man in the face and stomach at a park in Antioch. Reporter's Transcript ("RT") at 512–13. He also testified that he saw Aaron reach his hand into the man's pocket after he fell. RT 514. Cruz explained that when he later approached Aaron, Aaron threatened and assaulted him. RT 528–29. Cruz testified that when Aaron ran away, he ran after him. RT 529–30. Another person joined in the on-foot pursuit for Aaron, and the two of them ultimately caught him. RT 530. Cruz testified that five people helped tie Aaron up before the police arrived. RT 531. Argueta, the initial assault victim, testified that he

United States District Court
Northern District of California

was hit in the face by Aaron. RT 596. Argueta also testified that after he fell to the ground, Aaron

put his hand in Argueta's pocket. RT 598. When he got to the hospital, Argueta realized $50 was

missing from his pocket. RT 601. Cardona partially corroborated Cruz's testimony about the

assault of the old man, RT 577–78 (testifying that he did not see Aaron's face when he witnessed

the assault of Argueta, but he saw Aaron's clothing and "didn't lose sight of him"), the assault of

Cruz, RT 573, and details about the capture of Aaron, RT 574. Clairmonte provided consistent

testimony about the pursuit for Aaron. RT 682–83. Officer Kidd corroborated that Cruz and

Argueta had physical injuries on their heads. RT 616, 620. He also confirmed that when he arrived

at the scene, five people were standing around Aaron, who was tied up. RT 612, 614.

In short, while lacking the kind of scientific DNA evidence presented in the sexual assault

case, there was no dearth of evidence in the robbery case. And although Aaron notes there were

"inconsistencies" and "identification" issues with the evidence in the robbery case, he fails to

specifically identify these issues, let alone explain why they were prejudicial.

### iii.    Inflaming the Jury

Aaron argues that the Court of Appeal erred in concluding there was no risk of inflaming

the jury by considering the robbery and the sex crime together. ECF 1 at 45–46. He explains that

"the attempted rape of a pregnant women . . . is the quintessential example of the type of case that

is inflammatory in nature" and that it is "a violent and distinctly personal offense." ECF 1 at 45.

In considering whether the sex crime was so inflammatory such that it made a conviction

for the robbery more likely, the Court of Appeal reasoned:

> Aaron contends the sex crime was far more inflammatory than the robbery,
> and thus acquittal of the robbery count would have been more likely if the
> charges had been tried separately. We find neither the robbery nor the sex
> crime to have been starkly more inflammatory than the other. Aaron suggests
> the sex crime was more inflammatory than the robbery, and we agree that the
> attempted rape of a pregnant woman is a quintessential example of an
> inflammatory crime, but we do not see how violently robbing an innocent 74-
> year-old man on a sidewalk in a public park would be significantly less
> inflammatory.

United States District Court
Northern District of California

ECF 15–17 at 11. In other words, the Court of Appeal determined that the sex crime against Doe and the robbery of Argueta both involved vulnerable victims. This rationale was mirrored in the Court of Appeal's consideration of whether the sex crime and robbery were of the same class as part of its § 954 analysis:

> "Same class" has been defined to mean "offenses possessing common characteristics or attributes." (*People v. Thorn* (1934) 138 Cal.App. 714, 734-735.) Because murder, rape, robbery, and kidnapping are all assaultive crimes against the person, they are "offenses of the same class of crimes," thus satisfying the statutory requirements for joinder under section 954. (*People v. Simon* (2016) 1 Cal.5th 98, 122, fn. 9.)
>
> Here, the robbery and the sex crime were both assaultive in nature. They also shared common characteristics because they both involved physical violence against vulnerable victims. During the commission of the robbery, Aaron punched 74-year-old Argueta in the face and stomach, knocked him to the ground, causing him to hit his head on the pavement, and ultimately rummaged through his pockets and wallet to rob him. In the sex crime, Doe was visibly pregnant, and Aaron knocked her to the ground and pulled her by the hair before forcing her to orally copulate him. Everything about these two incidents was "assaultive." Accordingly, the requirements for joinder under section 954 were met.

ECF 15–17 at 9–10.

Although Aaron stresses that the sexual assault charge was particularly inflaming, the Court cannot upset the Court of Appeal's reasonable finding that both the robbery and the assault involved a physically violent attack against a vulnerable victim. And, in light of the Court of Appeal's well-reasoned opinion, the Court cannot conclude that the moral differential between the two cases was such that joinder had a "substantial and injurious effect or influence" over the jury's guilty verdict in the robbery charge. *Sandoval*, 241 F.3d at 772 (citing *Bean*, 163 F.3d at 1086 (9th Cir.1998)).

\*\*\*\*

In sum, Aaron has failed to prove that the trial court's denial of his motion to sever was contrary to, or an unreasonable application of clearly established federal law because (1) there is

United States District Court
Northern District of California

no clearly established Supreme Court precedent dictating when a state court must sever criminal charges relating to separate incidents; and (2) he was not denied a fundamentally fair trial, Accordingly, habeas relief is not warranted. *See* 28 U.S.C. 2254(d)(1).

## C. Claim 3: Cumulative Errors

Aaron's final argument is that he was denied his Fourteenth Amendment right to due process because of the cumulative effect of multiple constitutional errors. ECF 1 at 29. This argument was raised in a single sentence in Aaron's petition.

"Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still prejudice[d] a defendant.'" *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996)). "[Courts] have granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to a key contested issue in the case." *Ybarra v. McDaniel*, 656 F.3d 984, 1001 (9th Cir. 2011) (quoting *Parle v. Runnels*, 505 F.3d 922, 933 (9th Cir. 2007)).

A petitioner must distinctly raise cumulative error as an issue at the state level for purposes of exhaustion before seeking federal habeas review. *See Solis v. Garcia*, 219 F.3d 922, 930 (9th Cir.2000) (the district court properly declined to review petitioner's cumulative-error claim when the claim was not presented during the state-court appeals). Having reviewed the papers in the state court proceedings, it is not apparent to the Court that Aaron raised a cumulative error claim there. *See* ECF 15–14 (opening brief in state court), 15–17 (state court opinion).

Even if Aaron had raised and exhausted such a claim, *see Wooten*, 540 F.3d at 1025 (9th Cir. 2008) ("Claims are 'sufficiently related' or 'intertwined' for exhaustion purposes when, by raising one claim, the petition clearly implies another error."), the state court had a reasonable basis for concluding that no error occurred with regard to each of Aaron's habeas claims. Where,

as here, "there is no single constitutional error ..., there is nothing to accumulate to a level of constitutional violation." *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir.2002); *see also Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if there was "no error of constitutional magnitude occurred, no cumulative prejudice is possible"). Because there is a reasonable basis for concluding that the cumulative effect of Aaron's alleged errors did not render his trial "fundamentally unfair," and Aaron has not shown otherwise, the Court denies relief on this claim. *Ybarra*, 656 F.3d at 1001 (quoting *Parle*, 505 F.3d at 927).

## D. Request for an Evidentiary Hearing

Under AEDPA, the Court shall not hold an evidentiary hearing unless a petitioner shows that: (A) a claim relies on either a new rule of constitutional law made retroactive and previously unavailable, or a factual predicate that could not have been previously discovered through the exercise of due diligence; or (B) "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

In *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011), the United States Supreme Court clarified the legal landscape as to evidentiary hearings under § 2254(e)(2) by holding that habeas "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Id*. at 180-81. The Supreme Court reasoned that the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made" and that therefore the record under review must be "limited to the record in existence at that same time i.e., the record before the state court." *Id*. The Supreme Court held that this reading was "compelled" by the structure of AEDPA, which conveyed "Congress' intent to channel prisoners' claims first to the state courts." *Id*. at 182-83. It further held that "evidence introduced in federal court has no bearing on § 2254(d)(1) review" and that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation

of § 2254(d)(1) on the record that was before the state court." *Id*. at 185. The Supreme Court noted that this construction did not render superfluous § 2254(e)(2), which sets limits on the availability of evidentiary hearings, as explained above. *Id*. at 186-86.

Aaron's request for an evidentiary hearing is raised in a single sentence in his petition. ECF 1 at 30. Aaron has made no arguments in support of his request and his claims do not appear to raise any factual disputes that require an evidentiary hearing. *See Cullen*, 563 U.S. at 183 (when state court record precludes habeas relief under § 2254(d), district court not required to hold evidentiary hearing). Accordingly, the request for an evidentiary hearing is DENIED.

### E. Certificate of Appealability

No certificate of appealability is warranted in this case. *See* Rule 11(a) of the Rules Governing § 2254 Cases (requiring district court to rule on certificate of appealability in same order that denies petition). Aaron has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

## IV.   ORDER

For the foregoing reasons,

(1) Aaron's request for a writ of habeas corpus is DENIED;

(2) Aaron's request for an evidentiary hearing is DENIED;

(3) A certificate of appealability is DENIED; and

(3) The Clerk shall enter judgment and close the file.

Dated: January 7, 2021

BETH LABSON FREEMAN
United States District Judge